Good afternoon, Illinois appellate court First District Court is now in session. The Fifth Division, the Honorable Justice Maureen E. Connors presiding case number one eight dash two six zero five. People versus Jeremy Borders. Thank you very much, Darren, and good afternoon, justices and good afternoon, attorneys. How are we doing today? Welcome to the appellate court on Zoom. Can I ask the lawyers, first of all, if you would identify yourselves by stating your name, who you represent and spell the name last name for the record, please, if you would. We want to begin with the defense counsel. My name is Katie Anderson. A.N.D.E.R. S.O.N. and I represent the appellate Jeremy Borders. And thank you for agreeing to hold this argument via Zoom. You're welcome. Thank you. Sir, good morning, your honors, I am Assistant State's Attorney Joseph Alexander A.L. E.X. A.N.D.E.R. on behalf of the people of the state of Illinois. Thank you very much. Pursuant to Supreme Court Rule three fifty two, you get at least or no more than I should say 20 minutes to argue on your main argument. You may reserve some time if you wish for rebuttal. Miss Anderson, is that what you want to do or you want to go full 20? I would like to reserve three minutes for a bottle, please. OK, 17 minutes it is for you. All right. Very well. I think we've got everything ready here. And Miss Anderson, are you ready to proceed with your you know, we've read the briefs, we've read the cases, we're pretty familiar with the facts. And so if you want to get your main argument first, that would be great. And the justices will be asking questions whenever they are ready. So thank you. Please consider continue. Excellent. I am ready to proceed. May it please the court on behalf of the state appellate defender. My name is Katie Anderson and I represent the appellate Jeremy Borders. Today, I plan to spend my time talking about issue one in the briefs, which argues that the court erred in denying Borders motion to quash arrest and suppress evidence. But I am also prepared to address questions regarding issue number two, which is the argument that trial counsel was ineffective for failing to challenge the state's use of cellular phone data at as to the first issue, the trial court aired when it found that the state established probable cause for Borders warrantless arrest. And this court should overturn that finding and suppress all evidence that was obtained as a result of the illegal arrest, which includes all of Borders statements prior to arriving at the police station and all evidence that was recovered as a result. The police lacked probable cause at the time of Jeremy Borders warrantless arrest at the time law enforcement entered his apartment. It had a substantial amount of evidence that was directed against his co-defendant, Stokes and Watts. But the only evidence that was specifically directed at Borders was one, a cellular phone with a three one two prefix was part of an alleged calling pattern between Stokes, Watts and the victim. Two, this phone was somehow associated with Jeremy Borders and three, this phone was in the vicinity of the kidnapping. And I will talk about each of these three items, the sum of which simply does not amount to probable cause for Borders warrantless arrest. So I'm going to interrupt you and I apologize, but I want to get to a main point that really concerns me. As far as the testimony that was given, both at the motion to suppress and a trial, I believe officers would direct testified that there was information either from the FBI or for some or from Souther among our officer that the subscriber information was the phone belonged to Jeremy Borders and the address was three oh five North Leclerc. Is that your understanding as well? Yes, it's my understanding that he said specifically that they got his name from the subscriber information and then they got the address from the FBI after obtaining the name. OK, so then there's a stipulation that's entered into a trial by the two attorneys, the two sides, that there was no subscriber information attached to the phone number. Yes, that is correct. And I agree with your honor that that is particularly alarming because that creates a gap in the state's evidence as to how Borders specifically became a target of the investigation. The significance of that gap means that the state has never expressed. I'm sorry, did someone have a question? No, I don't know what that was. OK, I just wanted to make sure I wasn't talking over someone. But anyways, probable cause has to be directed at a specific person. There needs to be more than general proof that a crime has occurred to support the arrest of any specific individual. And probable cause or the search and seizure of a person needs to be supported by probable cause, particularized with respect to that person. So we have this huge gap in the evidence as to how the state was directed. I hate to interrupt, but do we even get to that? Do we even get to what the trial testimony was? Because there was no objection. You didn't raise this issue before the trial judge. You didn't raise it in any meaningful way in your post trial motion. But the only Supreme Court in the Brooks case was very clear that in order to use applying a motion to suppress, you have to raise you have to have a contemporaneous objection when the evidence comes in. Why would that be? Because the witnesses on the stand, it puts the state on notice. It gives the trial judge the opportunity to actually reweigh credibility as opposed to asking us to do it for the first time on appeal. But this court ruled in 2019 and people in People v. Horton that, quote, since Brooks, appellate decisions have repeatedly held that this limit applies only to considering trial evidence when a defendant fails to renew his or her objection to the denial of the suppression notion in a post trial motion. Well, so I know Justice Hyman wrote that. And he's a friend of mine. He's a very smart guy. But the last time I checked, Supreme Court decisions aren't advisory and we follow their decisions, they don't follow ours. But even if we look at your post trial motion, there's nothing in it that raises this issue. There's no meaningful invitation to the trial judge to reweigh credibility in light of some discrepancy. Right, all your post trial motion says is that the trial court erred in denying pretrial motions, plural, that lacks any specificity. Well, that does arguably lack any specificity. The motion to suppress and quash evidence was the most significant post trial motion that was litigated prior to trial. There was an extensive hearing. So it's very clear that when the defense counsel referred to the pretrial motions, it was it it should have been very clear that it was specifically referring to in your brief. I mean, it was a different judge who heard the motion to suppress versus the judge who tried the case. And I, I guess I'm what the biggest hurdle I have here with your arguments is none of this this was not raised before the trial judge. Trial judge never had an opportunity to address these discrepancies. However, the trial judge, though, did have an opportunity to review the pretrial ruling and review the discrepancies if it chose to do so, because the issue was raised in the post trial motion, so the trial court did, in fact, have the opportunity to review this issue and it chose not to. Further, part of the purpose of appeal is to give us an opportunity to further scrutinize information that may not have been specifically addressed in the trial court. There was certainly a lot going on with this case, and that is part of the purpose of appeal is to allow us thought if you didn't raise it before the trial judge, it's subject to plain air on appeal. It's news to me that you can you can raise things for the first time on appeal. This basic issue, though, was raised before the trial court. There was certainly extensive litigation regarding the probable cause hearing. And again, counsel did state in the post trial motion that she was raising all of those issues, thus putting them back on the table. And so the trial court did have an opportunity to reweigh and review the evidence if it chose to do so in your counsel. All right, let's see, I believe I was talking about the issues with the state's inability to explain how the cell phone came to be  targeted at a specific person. But to the extent that the state's theory here amounts to, you know, the FBI gave us this information and we're just going to take their word for it. That also is actually not permitted under the case law in people. The Mormon, the second district clearly stated that when it comes time for the state to justify its actions in court, we must be presented with the relevant information that the officers were acting upon insofar as a judicial determination regarding the propriety of a seizure is concerned, there's no doctrine that simply allows an officer to act in good faith on the word of another officer. And that is basically precisely what happened here. So in short, it is our position that the gap in evidence as to how borders came to the attention of the police and how he became a target of this investigation is certainly a problem. There's also additional problems with the state's evidence to establish probable cause, which basically boils down to essentially nine phone calls between borders and his friend, Watts. At the motion to suppress hearing, Detective Swiderak testified that orders became the target of this investigation because, you know, of this cell phone pattern. And if I could, they were nine phone calls that occurred in the proximity of the kidnapping and in closely linked in time. And so I guess I'm puzzled why this case wouldn't when you talk about particularized probable cause, why wouldn't fall into a case that you cited, Maryland versus Pringle, where you have three individuals in a car, a private place, not like a bar, not a bar, three individuals in a private place and contraband found in the car. It supplies probable cause against all three. Why wouldn't that same analysis applies here? They're in the vicinity, not of a bar, but of a private residence where they have probably no justifiable reason to be, except for it happens to be the scene of a kidnapping. And you've got Watts and borders linked by their cell phone data there, both in place and time. Well, as to how this case would be distinguishable for Maryland v. Pringle, as you noted, that involves three defendants in the same car. Here we have three defendants who were connected to the same cell phone tower because the cell phone data does not do any more than be able to tell us what cell phone tower a particular cell phone was connected to and the individual cell phone towers in this area span an area in the areas of town we're talking about span a minimum of several blocks. Also, just because the cell phone is connected to a particular tower, it doesn't necessarily mean that's even the closest tower. It just means that's the tower that had the strongest signal. So instead of having three people in the same car, we have three people in the same general area of town and borders happens to be making phone calls with one of them. That essentially is basically saying that near proximity to someone else who's involved in a crime gives rise to probable cause, and that is simply not enough to reach a particularized determination of probable cause with respect to any one individual. Furthermore, the nine phone calls between borders and Watts took place over a span of about 16 hours. So that's actually not an unreasonable number of phone calls between two fronts, particularly when we compare it to the fact that there were about 50 phone calls between border or I'm sorry, there are about 50 phone calls between Stokes and Watts during this exact same time period. There were also 17 calls between Watts and another number that we don't believe is involved in the offense. Also, when we go back to Detective Switerek at the motion to suppress hearing, he gave very clear testimony about how Stokes, Watts and Mr. Favella, the victim's phone were all connected. So we know that Stokes made a ransom call to the victim's widow. And Stokes also made several blocked calls to the victim at times that were of interest and Switerek. So basically, Switerek testified that they started with the victims and his wife's call logs. They got Stokes's number. Based on that, they developed an interest in Watts's phone because Stokes's call logs show that immediately after Stokes called the victim, he was in contact with Watts. So Switerek's testimony established this very clear connection between Stokes, Watts and the victim. But when we talk about tying borders phone into that specific pattern, the two phone calls, there's no connection actually between borders and the crucial phone calls between Stokes and the victim. So Stokes called the victim. It was just a hub and spoke conspiracy that wouldn't require. I mean, it's not exonerating that there's not a contact between Stokes and borders, there's just not contact between them. But they certainly have contact with with Watts. They both do. Yes, however, having contact with someone who is involved in a criminal offense is, first of all, not a crime. And second of all, is not sufficient to give rise to probable cause. It needs to be a much more particularized determination. And when we take a closer look between when these phone calls happened, Stokes called the victim at one oh five and he did call Watts directly afterwards. But there are no phone calls from Watts to borders or from anyone else to borders during this time. And then there's also an issue with the call pattern regarding the second phone call between Stokes and the victim. Stokes called the victim again at one forty one p.m. and the allegation was that there was then this call pattern involving all three of the other defendants. But and so Stokes calls for Bella at one forty one p.m. and Stokes's call log indicates that he tried to call Watts at one forty two p.m. But when we take a closer look at the evidence, it actually doesn't look like that call went through. So Stokes's call log says that he dialed Watts's number, but there's a separate column reflecting the number that was actually called. And this number is blank on Stokes's call log for that one forty two call to Watts. And the duration said it was only a second long. And when we look at Watts's call log for the same period of time, it does not reflect an incoming call from Stokes at one forty two. The next call between Stokes and Watts is not until one fifty five. So at one forty, we have phone calls between Stokes and the victim. And then we have phone calls between Watts and borders at one forty four and one forty seven. But there is no pattern that connects all four of them on the afternoon of the offense. And that's significant because Detective Swiderak testified that they connected borders to this pattern of calls. But when we take a closer look at the call logs, that argument kind of falls apart. Also, can I ask you, you're running out of time. I want to ask you about attenuation. And what do you think needs to have attenuation hearing about whatever? First of all, it's our primary position that if there were to be an attenuation hearing, the evidence that would be at issue, there would be border statements in the back of the police car, which would be the statements that led the police to discover the victim's body and any of the evidence recovered at one one thirty six North Springfield. So that would be the evidence that would be subject to an attenuation hearing. It is our primary position that this court can determine on the record that his statements in the police car were not attenuated. However, we certainly have no quarrel with the state's argument that it remains for an attenuation hearing would be an appropriate remand in this case, particularly if this court finds that it does not have enough information to rule on that particular issue. To include the identification by Robles in the lineup. Actually, yes, the identification by Robles in the lineup would also be subject to that attenuation hearing. Thank you very much, Your Honor. OK, any further questions? Yes, so I think you just said that your primary position is that we can basically outright reverse on this record, finding there was insufficient attenuation. Is that your primary position? Yes. OK. And one thing you didn't touch on, which was after 10 years doing this, I haven't seen it before, the rescue doctrine. All right. And both sides have discussed that if we were to adapt the rescue doctrine, how would that affect our analysis? Were to adopt the rescue doctrine that actually if this court were to adopt the rescue doctrine, it should actually find that that doctrine still actually does not apply in this case. And this is why. So the rescue doctrine requires that the questioning be driven by a desire to rescue. Here, the question that was posed was, is this your phone? It was about ownership of a phone. It was not about the location or the condition of the victim. So even if this court were to adopt and apply the rescue doctrine, border statements would still not be admissible. Thank you. Any further questions? All right, counsel, they want to sum up in a minute, please. For these reasons and the reasons argued in our opening brief, we this court should overturn the trial court's finding of probable cause and suppress all the evidence recovered as a result of borders, a legal arrest in the alternative. This court should reverse and are manned for an attenuation hearing regarding all of the evidence recovered at one one thirty six North Springfield border statements leading to the recovery of that arrest and David Robles is lineup identification at the police station. Thank you, Miss Anderson. Mr. Alexander, before you start, I'm going to ask my clerk to come into my chambers because my light has gone off on automatic new lighting here. And I want to turn back on. Excuse me, Meryl. Can you turn one on, please? OK, back in business, thank you. And Mr. Alexander, are you ready to proceed, sir? I am, Your Honor. One minute you may begin. Thank you, Your Honor. Good afternoon, Your Honors. May it please the court. I am assistant state's attorney, Joseph Alexander, on behalf of the people of the state of Illinois. We ask that you affirm the defense, the defendant's conviction and affirm the dismissal of the denial of his motion to quash arrest and suppress evidence because the police have probable cause to arrest defendant where there was ample evidence to suggest that he was involved in the victim's kidnapping and exigent circumstances justified the officer's warrantless entry into his apartment. At the outset, it's important to realize that probable cause is not reasonable doubt. The information that officers need does not have to be sufficient to convict a defendant beyond a reasonable doubt. It is sufficient if it allows a reasonable person to believe that the person is involved in criminal activity and probable cause. Does it even require that the officers know what the criminal activity is? So when we are talking about probable cause, we have to remember that these are probable cause and reasonable doubt or two different standards at the time of the arrest. What evidence was there that the defendant committed an offense as opposed to the people sort of surrounding him? Well, so we when we talk about what particularized evidence we have, we look at the phone records and as we discussed in our brief, the phone records established a pattern. Now, defendant disagrees with that, but we're not only looking at the phone records, we're looking at these calls, who made the calls, when they made the calls, where the calls were made, and when we're talking about probable cause that the officers can take into consideration the totality of the facts known to them. And so we have what is known to the officers. A kidnapping had occurred. We have a witness coming to the station telling them that there was a kidnapping, there was a beating. He was tied up. He was bound with duct tape, put in the bathtub. He identified the number of people that were involved. The police went to the scene, found evidence supporting that there was a kidnapping, the officers, the FBI got involved and they pulled phone records and they looked at the phone records and they saw a pattern of calls around the time of the kidnapping. And those calls were happening during in the vicinity of the kidnapping. So when we take all of that into consideration, there was a sufficient probable cause. For this defendant, once he was identified as being one of the callers in that pattern and then was he identified of that council, all they had was a phone number that could be the phone could have been used by anybody else. When was he identified before they entered? Before they entered the apartment, there was a meeting with the Chicago Police Department and the FBI. And during that meeting, that is when the FBI. Informed the Chicago police of the defendant's identity, they connected, the FBI connected the defendant to that phone number, and they also connected the defendant to the address. And police officers can rely on information that others have. And so we have the Chicago police officers. Relying on information that the FBI uncovered during their investigation. And so when the when the Chicago police officers learned from the FBI that the defendant was connected to the 312 number and this was and learned of his location, they went to that location, found defendants name on the mailbox and proceeded to enter his apartment. And so when you say defendant, they knew there was a phone number connected to this, not a defendant. Well, they knew that based on the Chicago police officers, based on information that they got from the FBI, knew that defendant was connected. Jeremy Borders was connected to the 312 number because they were using. In addition to looking at call records, they were also pinging these phones back and forth, which led them to the location of the phone. But let's concede the phone is pinging like crazy. All right. Does the fact that a phone is registered under the primary name of an individual, does that give them probable cause that that individual somehow is involved in the crime that's doing all the pinging? I mean, there are plenty of times I pick up my phone and it's someone's daughter or spouse's name on the screen because they have a family plan. Your Honor, again, this and this goes back to my argument about reasonable doubt in and of itself. That may not be sufficient to establish probable cause. But what we have here is more than just the phone. We do have the identification. We have the identification. I'm sorry, not the identification. We have Robles testifying to the number of people he believed involved in this crime. We have the number being in the call logs. We have the number being in the vicinity of that, of the kidnapping. We have the phone pinging from Jeremy Borders apartment. We have Jeremy Borders being there. There's no other evidence that there was anyone else living in this apartment. We have a connection between those three numbers. There's this pattern. There is also evidence of the other two defendants being involved in the crime. And even though that is not. Specifically directed towards borders, it can be considered in the totality of a probable cause determination. So why couldn't they bring all this information to a judge and get a warrant would be so much easier. And they get a warrant for one of the defendants the day before. I don't believe they I believe they got a warrant for records. I don't believe they got a warrant for any of these defendants. I don't believe there was a warrant for any of the defendants. But still, couldn't they go and get a warrant from a court? Why couldn't they have done that? Well, Your Honor, because what we're looking at here is this isn't a. Murder where there's a deceased victim, where there's no longer a life in jeopardy. We have a kidnapping. We have evidence of of the victim being severely injured because of all the blood at the scene. What the primary concern for these officers from the beginning was finding the victim. And so time was of the essence. So locating. The defendants could have led to the victim and possibly save the victim's life. In this case, it's unfortunate that the victim was killed. So what we're looking at here is not so much. We're trying to apprehend the defendants to bring them to trial. We're trying to find the people responsible so we can find the victim and potentially get this victim some help. And that's where the rescue doctrine comes in. When we're talking about probable cause, but before we even get to probable cause and the rescue doctrine, there was exigent circumstances that justified the warrantless entry into defendants home and those exigent circumstances were coupled. And it's our position coupled with probable cause based on the totality of the evidence known to the officers at the time. And you concede the rescue doctrine has not been adapted in Illinois, correct? Uh, I can see that it has not been adopted in Illinois. It was not adopted in the case that was discussed in our brief. It was not adopted for the outline, the various reasons. And I am for some reason now blanking on those reasons. And just moving into the you can see that an attenuation hearing is needed based on this record. Or do you reject that contention? I I reject that contention. And to the extent that we believe that our argument that there was sufficient probable cause. Negates any need for this case to be reversed and sent back. But if this court finds that. There was a sufficient sufficient probable cause, it's our position that there wasn't this record wasn't developed for the purposes of attenuation. And that in that case, it needs to go back. So the record can be developed for that specific purpose. So let me ask you about the issue that I brought up with your opponent relative to the the information that the officer testified to relative to the name of the person that they were attempting to apprehend and the address. And then there was a stipulation, a trial saying that there was no subscriber information to those phone numbers. What do we do with that conflict or is it a conflict? It's not a conflict simply because under Brooks, this court cannot look rely on trial evidence to reverse a denial of a motion to cross arrest and suppress evidence. And I know defendant relies on Horton. But if we look at Horton, Horton was wrongly decided. It was based on Gill's and. Gills and Brannon and then Gills, they cited and mentioned Brooks, but they didn't provide much discussion or analysis of it. And in Brannon, it seems that the court was actually following Brooks. And if we look at the language of Brooks, the court was very clear. It wasn't that defendant could raise this in a post-trial motion. The defendant had to object when the contradictory evidence was was presented. And if we look at in general the rules of forfeiture, that is what we require anyway, that you have to make a contemporaneous objection and include it in a post-trial motion. Under Brooks, that is essentially following the rules of forfeiture where you have to make the contemporaneous objection. Defendant didn't make that contemporaneous objection when the evidence was presented and therefore defendant cannot rely on trial evidence to reverse the dismissal. The denial, I'm sorry, I've been doing a lot of post-conviction. All right, any further questions or you want to continue, counsel? Let's see, it's. We've got seven more minutes. You know, Your Honor, I believe that based on our arguments here and the arguments that are in our brief, we have sufficiently covered our reasons that we believe that the trial court properly denied defendant's motion to quash arrest and suppress evidence. So unless this court has any further questions, we simply ask that you affirm the defendant's conviction and affirm the denial of his motion. Thank you. Final word, Ms. Anderson. All right. Yes, Your Honors. Even if this court does not rely on the trial evidence in evaluating Borders Fourth Amendment claim, it should still find that the state lacked probable cause for his warrantless arrest. As I discussed earlier, the testimony about the call pattern involving Stokes, Watts and the victim is very clear. Those connections are clear. And at the motion to suppress hearing and still today, the state is just speaking in very general terms when it comes to how Borders connects to this pattern. They just keep saying there's a pattern, there's a pattern, there's a pattern. They haven't shown us the actual pattern. They haven't identified any actual calls. They're not going into the weeds on this. They're just expecting you all.  that there is a pattern. The state also wants you to believe that the primary concern of the officers when they entered his apartment was finding the victim, but that no one actually asked Borders any information about where the victim was and they didn't question him about that at all. They're basically arguing over and over that the state's actions were justified because they were so concerned with Favela. But when they actually arrested Borders in his apartment, the only thing they asked him about was a cell phone. And I'd also like to talk a little more about how the police ended up at his apartment. So the police talked to the FBI and Mr. Alexander argued today that during that conversation, they learned who Mr. Borders was and also where he was. You know, we know from the record and Borders case and also Watts's case that the FBI used a trigger fish device to find Watts's exact location and find admitted to using a trigger fish or stingray device to find Borders exact location in this case. In fact, in this case, the only information, the only location data they've introduced about Borders was through the testimony of Joseph Raschke, and they have basically stated that the only cell phone data they had was to determine what cell phone tower he connected to. So that certainly is a little bit concerning here is that the implication that they possibly used coming up here, the implication that they possibly used, you know, some technology to arrest Borders that they did not disclose they used during the motion to suppress hearing. And there was actually never any testimony offered by the state or anyone else or offered by the state that could pin Borders down to being at the Springfield address, you know, or at the location of the offense other than David Robles trial testimony, which was predicated on his identification of Borders after Borders had been arrested and taken to the police station. So without that arrest, we don't have Robles's identification of Borders to even tie in there. Also, when we're talking about the cell phones pinging like crazy, I think it's also important to note that we had a sufficient that there's significantly more data regarding Stokes and Watts because they used their cell phone users, particularly Stokes, if you take a look at those call details. So there's significantly more information being able to track their locations at all times. In contrast, Borders, we have fewer data points to work with. And also, again, the state has never officially disclosed using a trigger Fisher Stingray device to track border specific location like they acknowledge that they did with Stokes and Watts. That is everything I have on my notepad. Does anyone have any additional questions before I briefly conclude? Hearing none. Thank you very much for your presentation today, Ms. Anderson and Mr. Alexander as well. We'll certainly take this case under advisement and you'll be hearing from us soon as possible. Thank you very much for your presentation today.